**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| TAQUITA JONES, | |
| Plaintiff, | CIVIL ACTION NO. 4:21-cv-23 |
| v. | |
| ETHICON, INC. and JOHNSON & JOHNSON, | |
| Defendants. | |

**O R D E R**

In this products liability action, Plaintiff TaQuita Jones seeks to recover for injuries she allegedly suffered after being implanted with Defendants Ethicon, Inc. and Johnson & Johnson's medical device, the TVT-Obturator.[1]  (Doc. 1; doc. 43-1, p. 5.)  The case is presently before the Court on Defendants' Motion for Summary Judgment.  (Doc. 38.)  In their brief in support of their Motion, Defendants argue that all of Plaintiff's claims are barred by Georgia's two-year statute of limitations or, in the alternative, that most of Plaintiff's claims either fail and should be dismissed entirely or that they should be "merged" with either her strict liability failure-to-warn claim (Count III) or her strict liability design defect claim (Count V).  (Doc. 39.)  In response, Plaintiff argues that none of her claims are barred by Georgia's statute of limitations and that Defendants are not

---

[1] Ethicon, Inc. is a wholly owned subsidiary of Johnson & Johnson.  (Doc. 43-1, p. 2; doc. 43-2, p. 2.)  Plaintiff's case is one of over 100,000 lawsuits filed in federal court arising from injuries allegedly caused by pelvic mesh products.  (Docs. 1, 42, 43-1.)  Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multi District Litigation consolidated these actions for pretrial proceedings before the United States District Court for the Southern District of West Virginia.  (Doc. 42.)  This case originated in the Southern District of West Virginia as a part of MDL 2327 ("Ethicon MDL"), 2:12-md-2327.  (Docs. 1, 42.)  On October 13, 2020, that court ordered that Plaintiff's case be transferred to this Court, and that transfer was completed in January 2021.  (Docs. 42, 56.)  Defendants filed their Motion for Summary Judgment prior to that transfer. (Doc. 38.)

entitled to summary judgment on her negligence claim (Count I) and her gross negligence claim (Count XIV).  (Doc. 40.)  For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment.  (Doc. 38.)[2]

## BACKGROUND

### I.    Factual Background

On December 28, 2010, Plaintiff was implanted with an Ethicon TVT-Obturator (hereinafter, the "Device"), by Dr. Kathryn Hull in Savannah, Georgia.  (Doc. 1, pp. 3–4.)  This Device is a pelvic mesh product used for the treatment of stress urinary incontinence in females.  (Doc. 43-1, p. 5.)  On April 15, 2011, Plaintiff complained to Dr. Hull about what Dr. Hull described as "neurologic symptoms in . . . her right leg."  (Doc. 40-4, p. 3.)  After performing both a physical examination and a neurologic examination, Dr. Hull "felt that . . . the pain [Plaintiff] was experiencing and the neurologic symptoms she had were likely not gynecologic in nature" so she "wanted [Plaintiff] to see an orthopedist to address her concerns."  (Id. at pp. 3–4.)  Dr. Hull told Plaintiff that "the position of your legs in stirrups can cause some irritation with [a] nerve." (Doc. 40-2, p. 3.)  Thus, Dr. Hull referred Plaintiff to another doctor.  (Doc. 40-4, p. 4.)  In her deposition, Dr. Hull testified that, at this point in time, she did not attribute any of Plaintiff's symptoms to the Device and, instead, found that Plaintiff's symptoms were "more suggestive of a

---

[2] Many of the issues presented by Defendants' Motion could have been resolved by counsel without the filing of a motion and the needless expenditure of this Court's time and resources.  For example, as explained below, Plaintiff asserted a bevy of claims by incorporating by reference the Ethicon MDL Master Complaint.  Defendants now argue, among other things, that many of these claims are duplicative or not viable under Georgia law.  In response, Plaintiff appears to abandon many of her claims.  Counsel for Plaintiff and Defendants could have avoided the bulk of these arguments (and prevented the need for the Court to delve into them), through a simple phone call where counsel discussed which claims Plaintiff still asserts and which claims Defendants contest, followed by the filing of a joint stipulation informing the Court of the same.  In the future, the Court expects counsel to work together to resolve issues where they can and to assess where their true disagreements lie before coming to this Court to resolve them.

lumbosacral source" rather than a pelvic source.  (Id.)  Furthermore, at no point did Dr. Hull tell

Plaintiff that the Device was the cause of any of her pain.  (Id. at pp. 4–5.)

From June 2011 through March 2015, Plaintiff continued to suffer pain in her right leg and

visited several medical professionals.  (Doc. 40-2, pp. 6–16; doc. 40-3, pp. 3–4.)  In June 2011, an

orthopedist diagnosed Plaintiff with a herniated disk at the L4-L5 level, and Plaintiff received

several nerve block injections to treat the pain.  (Doc. 40-2, pp. 6–7.)  On August 9, 2011, and

September 21, 2011, Plaintiff underwent transforaminal nerve root blocks at the L4-L5 level by

Dr. Chandresh Viradia.  (Id. at p. 6; doc. 40-3, p. 3.)

In December 2011, after seeing a law firm's television advertisement about pelvic mesh

lawsuits, Plaintiff sent paperwork to the law firm.  (Doc. 40-2, pp. 3–5.)  During her deposition,

however, Plaintiff testified that she could not remember the type of paperwork she sent to the law

firm.  (Id. at p. 4.)  As to why she decided to submit the paperwork, Plaintiff elaborated as follows:

> I was inquiring . . . what all the mesh did . . . [b]ecause I had been going to [an
> orthopedist] . . .[to whom] my gynecologist, who did the surgery [to implant the
> Device,] referred me . . . because of the pulling in the leg.  But then I realized I also
> had the mesh.
>
> . . .
>
> I saw some advertisements, but it didn't really—it didn't really dawn on me.
> Because Dr. Hull said, you know, sometimes when the—the position of your legs
> in stirrups can cause some irritation with that nerve.

(Id. at pp. 3–4.)  Plaintiff was then asked whether she sent in the paperwork "because [she was]

questioning whether . . . the pain [she was] having was from the pelvic mesh," to which Plaintiff

responded yes.  (Id. at p. 4.)

In 2012, Plaintiff visited Dr. Kevin Stevenson, a spine specialist who told Plaintiff that he

believed her pain "may be vaginal."  (Id. at p. 7.)  Dr. Stevenson referred Plaintiff to Dr. Stephen

Durkee, a gynecologist who performed a pudendal injection "inside of the vagina area" in an effort

to treat Plaintiff's pain.  (Doc. 40-2, pp. 7–8; doc. 40-3, p. 4.)  When the third injection caused Plaintiff's pain to increase, Dr. Durkee told Plaintiff he was "not familiar with the area of mesh" and that she needed to see a urogynecologist.  (Doc. 40-2, pp. 7–8.)  Plaintiff then visited Dr. Victoria Shirley, a gynecologist, who told Plaintiff that she had "a lot of tension" and that she recommended surgery to "take some of the mesh out to relieve some of the tension."  (Id. at pp. 9–10.)  In June 2013, Dr. Shirley performed a mesh revision surgery on Plaintiff.  (Id. at p. 10; doc. 40-3, p. 3.)  Because Plaintiff's pain persisted, Plaintiff visited Dr. John Miklos, who performed a second mesh revision surgery on March 17, 2015.  (Doc. 40-2, pp. 12–13; doc. 40-3, p. 4.)

## II.    Procedural History

On May 8, 2015, Plaintiff directly filed her Short Form Complaint with the MDL court. (Doc. 1.)  Plaintiff's Short Form Complaint incorporated, by reference, the First Amended Master Complaint, (doc. 43-1), and alleged all but two of the claims in the Master Complaint.  (Doc. 1, pp. 1, 4–5.)  Specifically, the Short Form Complaint incorporated sixteen counts raised in the Master Complaint: "Count I – Negligence;" "Count II – Strict Liability – Manufacturing Defect;" "Count III – Strict Liability – Failure to Warn;"  "Count IV – Strict Liability – Defective Product;" "Count V – Strict Liability – Design Defect;" "Count VI – Common Law Fraud;" "Count VII – Fraudulent Concealment;"  "Count VIII – Constructive Fraud;" "Count IX – Negligent Misrepresentation;" "Count X – Negligent Infliction of Emotional Distress;" "Count XI – Breach of Express Warranty;" "Count XII – Breach of Implied Warranty;" "Count XIV – Gross Negligence;" "Count XV – Unjust Enrichment;" "Count XVII – Punitive Damages;" and "Count XVIII – Discovery Rule and Tolling."  (Id.)  Defendants then filed the at-issue Motion for Summary Judgment.  (Doc. 38.)  Plaintiff filed a Response in Opposition, (doc. 40), and

Defendants filed a Reply, (doc. 41).  The MDL court subsequently ordered that Plaintiff's case be transferred to this Court, "the venue[] from which it arises[s]."  (Doc. 42, pp. 1, 4.)

In their Motion, Defendants argue (1) that all of Plaintiff's claims fail as a matter of law because they are barred by Georgia's two-year statute of limitations; (2) that Plaintiff cannot establish a claim for a manufacturing defect (Count II); (3) that Georgia law does not recognize a "defective product" variation of strict liability (Count IV); (4) that Counts I, VI, VII, VIII, IX, X, and XIV[3] should be merged with Plaintiff's strict liability for failure to warn claim (Count III) and Plaintiff's strict liability for design defect claim (Count V); (5) that Plaintiff's breach of express and implied warranties claims fail (Counts XI and XII); and (6) that Plaintiff's unjust enrichment claim (Count XV) is not valid.  (Doc. 39.)  In response, Plaintiff argues that none of her claims are barred by Georgia's statute of limitations and that the Court should not merge her negligence claim (Count I) and her gross negligence claim (Count XIV) with her failure to warn and design defect claims (Counts III and V).  (Doc. 40.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

---

[3]  Defendants also assert that Plaintiff's "Violation of Consumer Protection Laws" claim (Count XIII) should be dismissed.  (Doc. 39, p. 5.)  However, Plaintiff did not incorporate Count XIII from the Master Complaint into her Short Form Complaint and, thus, did not allege Count XIII.  (Doc. 1, p. 5.)

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis omitted).

**DISCUSSION**

## I.     Choice of Law

For cases directly filed with an MDL court and then subsequently transferred pursuant to 28 U.S.C. § 1404, the transferee court's choice-of-law rules govern.  See Wahl v. Gen. Elec. Co., 786 F.3d 491, 494 (6th Cir. 2015) ("[B]ut for the MDL, [the plaintiff] would have filed [in the Middle District of Tennessee] in the first place.  Accordingly, Tennessee choice-of-law rules apply in this case.").  Here, Plaintiff directly filed the Short Form Complaint with the Southern District of West Virginia, (doc. 1), which then transferred Plaintiff's case to this Court pursuant to 28 U.S.C. § 1404(a), (doc. 42, pp. 1–2, 4).  Thus, Georgia's choice-of-law rules apply.

"Georgia follows the traditional rule that in tort actions, the law of the place of the injury– or lex loci delicti–governs the resolution of the substantive issues."  Best Canvas Prods. & Supplies v. Ploof Truck Lines, Inc., 713 F.2d 618, 621 (11th Cir. 1983).  Under the rule of lex loci delicti, "a tort action is governed by the substantive law of the state where the tort was committed."  Dowis v. Mud Slingers, Inc., 621 S.E.2d 413, 414 (Ga. 2005); see also Auld v. Forbes, 848 S.E.2d 876, 879 (Ga. 2020) ("The place where the tort was committed, or, the locus delicti, is the place where the injury sustained was suffered . . . .").  The parties do not dispute that Plaintiff was implanted with the device in Savannah, Georgia, that she sustained her alleged injuries in Georgia, or that Georgia law applies.  Thus, Plaintiff's claims are governed by Georgia law.

## II.     Statute of Limitations

Under Georgia law, "actions for injuries to the person shall be brought within two years after the right of action accrues."  O.C.G.A. § 9-3-33.  "[T]he scope of application of this statute of limitations is determined by the nature of the injury sustained rather than the legal theory underlying the claim for relief."  Daniel v. Am. Optical Corp., 304 S.E.2d 383, 385 (Ga. 1983).

Thus, Georgia's two-year statute of limitations for personal injury actions applies "regardless of whether [the claim] is based upon an alleged breach of an implied warranty or is based upon an alleged tort." Adair v. Baker Bros., Inc., 366 S.E.2d 164, 165 (Ga. Ct. App. 1988).  Because the nature of Plaintiff's injury allegedly sustained in the present case is an injury to her person, O.C.G.A. § 9-3-33 applies to all of Plaintiff's claims.  See Daniel, 304 S.E.2d at 385 ("Because the nature of the injury sustained in this case is an injury to the person, O.C.G.A. § 9-3-33 . . . applies."); Smith, Miller & Patch v. Lorentzson, 327 S.E.2d 221, 222 (Ga. 1985) ("The nature of the injury sustained in this case is an injury to the person, and O.C.G.A. § 9-3-33 therefore applies to Lorentzson's products liability claims."); Wheeler v. Novartis Pharms. Corp., 944 F. Supp. 2d 1344, 1351 (S.D. Ga. 2013) ("Although Plaintiff asserts claims for products liability and breach of warranty, '[t]he nature of the injury sustained in this case is an injury to the person, and O.C.G.A. § 9-3-33 therefore applies to [Plaintiff's] products liability' and breach of warranty claims.").

The parties agree that Georgia's two-year statute of limitations applies to Plaintiff's claims. The issue here is when the statute of limitations began running.  Defendants argue that the statute of limitations as to Plaintiff's claims began running in December 2011 because Plaintiff, who was already experiencing pain, reached out to legal counsel about pelvic mesh lawsuits and submitted paperwork to the law firm at that time.  (Doc. 39, p. 3.)  Thus, Defendants assert that the limitations period for Plaintiff's claims concluded in December 2013, nearly a year and a half before Plaintiff filed her Short Form Complaint.  (Id.)  Notably, Defendants do not argue any alternative time periods or dates when they claim the limitations period would have been triggered if it was not triggered when she submitted paperwork to the law firm in December 2011.   They focus

exclusively on arguing that the undisputed evidence proves that the statute of limitations began to run in December 2011.  (Id.)

Plaintiff, on the other hand, argues that a material question of fact exists as to when the statute of limitations began running.  (Doc. 40, pp. 4–10.)  According to Plaintiff, "deciding to seek legal advice based upon a suspicion of a causal connection between a plaintiff's injuries and a defendant's misconduct is, standing alone, insufficient to establish accrual as a matter of law." (Id. at p. 6.)  Plaintiff asserts that she "did not have any objective evidence that her physical symptoms were caused by the [Device] in 2011," that her "suspicion of a causal connection was quashed by the feedback she received from her physicians," and that her "years-long investigation into the cause of her symptoms is enough to raise a fact issue about when Plaintiff through reasonable diligence knew or should have known the causal connection between her symptoms and the [Device]."  (Id. at pp. 8, 10.)

"Georgia law is clear that the statute of limitations for a personal injury claim 'begins to run at the time damage caused by a tortious act occurs.'"  Atchison v. Bd. Of Regents of Univ. Sys. of Ga., 802 F. App'x 495, 507 (11th Cir. 2020) (quoting Everhart v. Rich's, Inc., 194 S.E.2d 425, 428 (Ga. 1972)).  However, in cases involving "'continuing torts,' where the plaintiff's injury developed from prolonged exposure to the defendant's tortious conduct," the "discovery rule" applies and "the statute of limitations does not begin to run until the plaintiff knows (or reasonably should know) the cause of her injury."  M.H.D. v. Westminster Schs., 172 F.3d 797, 804–05 (11th Cir. 1999); see also Carr v. Ethicon, Inc., No. 1:11-CV-2217-TWT, 2011 WL 4424457, at *2 (N.D. Ga. Sept. 20, 2011).  Specifically, "the discovery rule provides that 'a plaintiff's cause of action does not accrue, and the statute of limitations does not commence to run, until [she] knew, or through the exercise of reasonable diligence should have discovered, not only the nature (identity)

of [her] injury but also the causal connection between the injury and the alleged negligent conduct of the defendant.'"   <u>Luem v. Johnson</u>, 574 S.E.2d 835, 837 (Ga. Ct. App. 2002).

In deciding Defendants' Motion, the Court must view the evidence and draw all inferences in the light most favorable to Plaintiff, the party resisting the motion.   <u>See</u> <u>Ballew v. A.H. Robins Co.</u>, 688 F.2d 1325, 1327–28 (11th Cir. 1982).   Viewing the record in such light, the Court cannot conclude as a matter of law that the statute of limitations as to Plaintiff's claims began running in December 2011.   First, the record provides scarce detail concerning the content of the television advertisement that Plaintiff saw and the paperwork Plaintiff sent to the law firm.   The record does not indicate whether the advertisement mentioned Defendants' pelvic mesh products, the specific type of mesh product Dr. Hull implanted in Plaintiff, or the specific types of injuries the mesh products were allegedly causing.   It also does not indicate what specific actions the advertisement encouraged viewers to take (i.e., call, go to a Website, submit specific paperwork, etc.) and under what circumstances to take those actions (i.e., if the viewer had simply been implanted with the device versus if the viewer had been implanted with the device *and* was experiencing specified symptoms).   Indeed, the extent of the description in the record is Plaintiff's deposition testimony that she saw "some advertisements" about "pelvic mesh lawsuits." (Doc. 40-2, p. 3.)   Furthermore, Plaintiff does not remember—nor does the record reveal—the type of paperwork she submitted to the law firm.   When asked "what the paperwork was that [she] sent into the law firm," Plaintiff responded, "I just know it was paperwork." (<u>Id.</u> at p. 4.)   When asked the same question later, Plaintiff responded that "it may have been paperwork regarding the date of my surgery, what did I have [sic]." (<u>Id.</u> at p. 5.)   However, according to Plaintiff, she did not provide in the paperwork any information regarding the type of mesh product that was implanted into her because she "wasn't sure" at that time what product was implanted in her. (<u>Id.</u>)   Thus, a jury could certainly

find that the television advertisement and Plaintiff's response thereto did not provide her enough information to discover the causal connection between the pain she was experiencing and Defendant's product.

Second, even if viewing the television advertisement and sending paperwork to the law firm "could support a finding that [Plaintiff] knew or with reasonable diligence should have discovered the causal relationship between her injuries and the [Device], the evidence is equally susceptible of showing that [Plaintiff] did *not* know that the [Device] was causally connected to her injuries." Ballew, 688 F.2d at 1328 (emphasis added).  Dr. Hull, the gynecologist who implanted Plaintiff with the Device and initially treated her after surgery, testified that, as of April 15, 2011, she did not "attribute any of [Plaintiff's] complaints to her mesh sling implant," did not "tell [Plaintiff] that her mesh sling was the cause of any of her problems," and instead attributed Plaintiff's complaints to a problem in her back and told Plaintiff "to see an orthopedist to address her concerns." (Doc. 40-4, pp. 4–5.) Plaintiff testified that, based on Dr. Hull's diagnosis and the referral to the orthopedist, "it didn't really dawn on" her that the Device could be the cause of her injuries.  (Doc. 40-2, p. 3.)  Defendants have not pointed to any evidence that a medical professional advised Plaintiff, between April 2011 (when she was seen by Dr. Hull) and December 2011 (when she submitted paperwork to the law firm) that the Device was or may have been the cause of her pain.  Additionally, even after Plaintiff saw the television advertisement in December 2011, she continued to visit numerous doctors, and there is no evidence in the record before the Court that any of those doctors identified Defendants' alleged conduct as the cause of Plaintiff's pain. (Id. at pp. 6–8; doc. 40-3, pp. 3–4.)  Plaintiff did not even have her first mesh revision surgery until June 2013.  (Doc. 40-2, p. 10; doc. 40-3, p. 3.)  Thus, the evidence could support a finding that, as of December 2011, Plaintiff "was without knowledge of a relationship between her

11

injuries" and Defendants' conduct and "that she was exercising reasonable diligence in trying to ascertain whether her injuries were caused by" Defendant.  Ballew, 688 F.2d at 1328.

The Court is not suggesting that an official medical diagnosis is necessary for the statute of limitations to begin running.  See Deans v. Dain Mgmt., Inc., 411 S.E.2d 354, 357 (Ga. Ct. App. 1991) ("We do not hold, as appellant argues, that a medical diagnosis is necessary before the statute of limitations begins to run.").  Rather, based on the specific facts at hand, the Court cannot find as a matter of law that the statute of limitations for Plaintiff's claims began running in December 2011.[4]  A question of material fact exists as to when Plaintiff knew or should have known of the alleged causal connection between her pain and Defendants' conduct, and that is an issue for jury determination.  See Andel v. Getz Servs., Inc., 399 S.E.2d 226, 227–28 (Ga. Ct. App. 1990) ("[W]hether [the plaintiff] should, through the exercise of reasonable diligence, have discovered the causal connection between [her] illnesses and the alleged negligence of defendant is an issue for jury determination.").  Accordingly, the Court rejects Defendants' Motion on the issue of timeliness.  (Doc. 38.)

## III. Defendants' Motion for Summary Judgment on Other Grounds

### A. Defendants are Entitled to Summary Judgment as to Counts II, IV, VI, VII, VIII, IX, X, XI, XII, and XV.

Defendants, in the alternative, move for summary judgment as to Counts I, II, IV, VI, VII, VIII, IX, X, XI, XII, XIV, and XV.  (Doc. 39, pp. 4–7.)

As to Count II ("Manufacturing Defect"), Defendants argue that "Plaintiff has presented no evidence that the TVT-Obturator device implanted in her 'depart[s] from the design

---

[4]  Again, the Court notes that Defendants, in their Motion for Summary Judgment, argued only that the Court should find that there is an absence of a genuine issue of material fact regarding whether the statute of limitations was triggered in December 2011.  Thus, the Court has not considered whether, based on the evidence, it was or may have been triggered on some later date.

specifications' or that any deviation from product specifications in the device was the proximate cause of her injuries."  (Doc. 39, p. 4.)  As to Count IV ("Strict Liability – Defective Product"), Defendants contend that "Georgia law recognizes three variants of a strict-liability claim (design, manufacturing, or warning), but not a stand-alone 'defective product' claim."  (Id. at p. 4.)

As to Count I ("Negligence"), Count VI ("Common Law Fraud"), Count VII ("Fraudulent Concealment"), Count VIII ("Constructive Fraud"), Count IX ("Negligent Misrepresentation"), Count X ("Negligent Infliction of Emotional Distress"), and Count XIV ("Gross Negligence"), Defendants maintain that those claims should be merged with Plaintiff's claims for "Strict Liability – Failure to Warn" (Count III) and "Strict Liability – Design Defect" (Count V).  (Id. at pp. 5–6.) Specifically, Defendants argue: (1) "In Georgia, '[g]eneral negligence is a theory of liability in a products liability claim.  It is not a stand-alone cause of action.' . . . [Thus, t]here is no difference between Plaintiff's strict-liability and negligence/fraud claims" (Counts I, VI–X and XIV), and they thus cannot remain as "distinct claims with separate analyses[,]" (id. at p. 5 (citing Georgia case law)); (2) each fraud-based claim (Counts VI–IX) is "based on alleged 'omissions, fraudulent statements, and misrepresentations in the label,' and each claim alleges that Ethicon 'knew the accurate information regarding the risks of [the product] but failed to disclose it in the warnings section.'  Thus, each is 'merely a failure to warn claim' that Plaintiff 'has already alleged,' and they should be dismissed based on their duplicative nature[,]" (id. (citing Georgia case law)); (3) "Georgia does not recognize Plaintiff's negligent infliction of emotional distress claim as a stand-alone claim," (id. at p. 6 (citing Georgia case law)); and (4) constructive fraud "exists only as an equitable doctrine and will not support an action in tort for damages," (id. (citing Georgia case law)).

Next, Defendants assert that Plaintiff's claims for "Breach of Express Warranty" (Count XI) and "Breach of Implied Warranty" (Count XII) are barred by a four-year statute of repose because "delivery of Plaintiff's [Device] was tendered before her December 28, 2010 implant[, and t]herefore, Plaintiff's breach of warranty causes of action expired in 2014 and are time barred . . . [and] Plaintiff otherwise cannot establish the essential elements of a breach of warranty claim." (Id. at pp. 6–7.)  Finally, Defendants contend that Plaintiff does not have a valid claim for unjust enrichment because "unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails," and Plaintiff has not alleged a contract claim and cannot show the necessary privity between Plaintiff and Ethicon.  (Id. at p. 7.)

In her Response, Plaintiff contests this portion of Defendants' Motion only as to Counts I ("Negligence") and XIV ("Gross Negligence") and neglects to address Defendants' arguments as to her other claims.  (See doc. 40, p. 2 ("Plaintiff contests Defendants' summary judgment motion on statute of limitations.   Additionally, Plaintiff contests Defendants' summary challenge to the individual claims of Negligence (Count I) and Gross Negligence (Count XIV)".).)

In the face of Defendants' assertion that Plaintiff has no evidence to support her claim for "Manufacturing Defect" (Count II) and that both of her breach of warranty claims (Count XI and Count XII) are barred by the statute of repose, Plaintiff makes no effort to at least show an issue of material fact.  As to Count IV ("Strict Liability – Defective Product"), Plaintiff makes no argument and points to no evidence to support a stand-alone "defective product" claim.  Likewise, as to the claim for Unjust Enrichment (Count XV), Plaintiff makes no effort to either show the privity that Defendants claim is necessary or to show that such evidence of privity is not necessary here.  Next, as to Counts VI through IX, which Defendants argue are all based on the same allegations as—and are thus duplicative of—Plaintiff's failure to warn and design defect claims,

Plaintiff fails to make any showing that these claims are premised upon facts distinct from the facts that support her claim for strict liability failure to warn and, thus, support some separate cause(s) of action, nor does she offer any legal argument indicating that she need not make such a showing, even on summary judgment.

Finally, as to Count X, Defendants are correct that "[t]here is no independent tort in Georgia for negligent infliction of emotional distress." Holbrook v. Stansell, 562 S.E.2d 731, 733 (Ga. Ct. App. 2002) (citing Lee v. State Farm Mut. Ins. Co., 533 S.E.2d 82 (Ga. 2000)). Thus, Plaintiff cannot maintain such a stand-alone claim under Georgia law.[5]  For these reasons and those stated in Defendant's Motion, the Court **GRANTS** Defendants summary judgment on Counts II, IV, VI, VII, VIII, IX, X, XI, XII, and XV.

Moreover, even if Defendants had not established that summary judgment is warranted as to each of these counts, Plaintiff has abandoned each of the claims she did not address in her Response.  When a plaintiff brings a claim in her complaint but later fails to respond to a motion seeking summary judgment against her on that claim, the plaintiff is deemed to have abandoned the claim.  See Clark v. City of Atlanta, 544 F. App'x 848, 855 (11th Cir. 2013) ("The district court, therefore, properly treated as abandoned the [plaintiffs'] excessive force and state law claims, which were alleged in the complaint, but not addressed in opposition to the motion for summary judgment."); Edmondson v. Bd. of Trustees of Univ. of Ala., 258 F. App'x 250, 253 (11th Cir. 2007) ("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her.  There is no burden upon the district court to distill every

---

[5] However, "generally, '[i]n a claim concerning negligent conduct, a recovery for emotional distress is allowed . . . where there is some impact on the plaintiff, and that impact must be a physical injury.'"  Id. (quoting Ryckeley v. Callaway, 412 S.E.2d 826 (Ga. 1992)).  Thus, Plaintiff is not barred from seeking to recover damages for emotional distress to the extent they are otherwise recoverable by her under Georgia law.

potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citing Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)); Merritt v. Gay, No. 5:14-cv-083, 2016 WL 4223687, at *5 (S.D. Ga. Aug. 9, 2016) ("When a plaintiff brings a claim in his complaint but later fails to respond to a motion seeking summary judgment against him on that claim, the plaintiff is deemed to have abandoned the claim.") (citing Clark, 544 F. App'x at 855), aff'd, 677 F. App'x 637 (11th Cir. 2017); Fowler v. Hill, 4:08-CV-0135-HLM, 2012 WL 12957109, at *2 (N.D. Ga. Feb. 6, 2012) ("The Court . . . observes that it is not required to engage in mind-reading.  Attorneys often begin a case by pursuing a particular course of action, but then ultimately decide to abandon claims at a later stage of the proceeding.").  Thus, to the extent that Defendants are not entitled to summary judgment on Counts II, IV, VI, VII, VIII, IX, X, XI, XII, and XV, the Court would deem those counts abandoned and would dismiss those claims without prejudice.[6]

### B.    Defendants are not Entitled to Summary Judgment as to Counts I and XIV

Concerning Plaintiff's negligence claim (Count I)[7] and her gross negligence claim (Count XIV), Defendants argue they "should be merged" with the strict liability for failure to warn claim

---

[6]  "[T]he issue of whether a claim should not proceed because it has been abandoned is not a matter on the merits of the claim but rather a matter 'in abatement.'"  Cessna v. Ethicon, Inc., No. 7:20-cv-37, 2020 WL 2121392, at *3 (M.D. Ga. Apr. 2, 2020) (quoting Bryant v. Rich, 530 F.3d 1368, 1374–76 (11th Cir. 2008) (distinguishing between merits issues for which judgment is appropriate and matters "in abatement" for which dismissal is appropriate, i.e., jurisdictional problems, service problems, and pleading defects)).

[7]  In the Master Complaint, Plaintiff alleges in Count I that "Defendants had a duty . . . to exercise reasonable and ordinary care in the manufacture, design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and training related to its Pelvic Mesh Products." (Doc. 43-1, p. 24.)  Plaintiff then alleges that Defendants breached this duty by, among other things: (1) "failing to design the Products so as to avoid an unreasonable risk of harm to women;" (2) "failing to use reasonable care in instructing and/or warning health care providers, the FDA and the public as set forth herein of risks associated with the Products;" (3) "failing to use reasonable care in marketing and promoting the Products;" and (4) "[o]therwise negligently or carelessly designing, manufacturing, marketing, distributing, warning, labeling[,] studying, testing or selling the Pelvic Mesh Products."  (Id. at pp. 24–25.)

(Count III) and the strict liability for design defect claim (Count V).  (Doc. 39, p. 5.)  Defendants

assert:

> Georgia courts disregard distinctions between strict-liability and negligence when
> assessing design and manufacture and apply the same analysis to claims of
> negligent or strict-liability failure to warn.   There is no difference between
> Plaintiff's strict-liability and negligence/fraud claims, and whether the Court
> "merges" the claims or dismisses them, they do not remain distinct claims with
> separate analyses.

(Id.)  In response, Plaintiff argues that the claims should not be merged because "strict liability

and negligence claims are distinct causes of action in product liability."   (Doc. 40, p. 11.)

Furthermore, Plaintiff claims that "Defendants fail to argue the absence of a material fact

pertaining to Plaintiff's negligence claim that would support granting summary judgment on that

count."  (Id. at p. 12.)  Thus, according to Plaintiff, the Court should deny summary judgment as

to her negligence and gross negligence claims.

### 1. Plaintiff's negligent design claim (Count I) is duplicative of her strict liability design defect claim (Count V), but the Court declines to grant Defendants' summary judgment on that ground.

The Court agrees with Defendants that Plaintiff's strict liability for design defect claim is

duplicative of her negligent design claim.  When analyzing strict liability design defect claims,

Georgia courts utilize the risk-utility analysis, which "incorporates the concept of

'reasonableness.'"  See, e.g., Banks v. ICI Ams., Inc., 450 S.E.2d 671, 673 (Ga. 1994).  Thus,

"only semantics distinguishes the cause of action for negligence and a cause of action pursuant to

O.C.G.A. § 51-1-11 (claiming strict liability for defective design)."  Id. at 674 n.3; see also Jones

v. NordicTrack, Inc., 550 S.E.2d 101, 103 n.5 (Ga. 2001) ("This Court has recognized that there

is no significant distinction between negligence and strict liability for purposes of the risk-utility

analysis.").

Plaintiff correctly asserts that the Georgia Supreme Court did not mandate the merger of strict liability design defect claims and negligent design defect claims in "every conceivable factual scenario," Banks, 450 S.E.2d at 674 n.3.  (Doc. 40, p. 11.)  In Banks, after ruling that the risk-utility analysis applies in strict liability design defect cases, the Georgia Supreme Court stated:

> While we recognize that the determination of whether a product was defective (involving the reasonableness of a manufacturer's design decisions), which is a basic inquiry for strict liability purposes, generally will overlap the determination of whether the manufacturer's conduct was reasonable, which is a basic inquiry for negligence purposes, we cannot agree that the use of negligence principles to determine whether the design of a product was "defective" necessarily obliterates under every conceivable factual scenario the distinction Georgia law has long recognized between negligence and strict liability theories of liability.  Hence, we see no reason to conclude definitively that the two theories merge in design defect cases.

Id. (citations omitted).  However, since the Banks decision, the weight of authority, including that of the Georgia Supreme Court, indicates that, in general, most courts consolidate strict liability design defect claims and negligent design defect claims.  See May v. Ethicon, Inc., No. 1:20-CV-322-TWT, 2020 WL 674357, at *3 (N.D. Ga. Feb. 11, 2020) ("The demarcation line between negligent design defect claims and strict liability design defect claims is not entirely clear under Georgia law.  'Georgia law has long recognized [the distinction] between negligence and strict liability theories of liability,' and the Supreme Court of Georgia has declined 'to conclude definitively that the two theories merge in design defect cases.'") (quoting Banks, 450 S.E.2d at 674 n.3); Schmidt v. C.R. Bard, Inc., No. 6:14-cv-62, 2014 WL 5149175, at *6 (S.D. Ga. Oct. 14, 2014) ("With regard to Plaintiff[']s negligence claims predicated on alleged design defects, both negligence and design defect 'claims use the same risk-utility analysis, and therefore will be treated as one claim.'"); Grieco v. Tecumseh Prods. Co., No. 4:12-cv-195, 2013 WL 5755436, at *5 (S.D. Ga. Oct. 23, 2013) ("General negligence is a theory of liability in a products liability claim.  It is not a stand-alone cause of action.  . . .  [Thus,] Grieco's stand-alone negligence claim fails.");

Frazier v. Mylan Inc., 911 F. Supp. 2d 1285, 1299–3000 (N.D. Ga. 2012) ("Regarding a negligent design defect claim and a strict liability claim for a design defect, both claims use the same risk-utility analysis, and therefore, will be treated as one claim.")  For example, in Ogletree v. Navistar International Transportation Corp., the Georgia Supreme Court stated:

> Division 2 of the [Georgia] Court of Appeals' opinion engages in the risk-utility analysis only after separately applying general negligence principles in Division 1. However, those concepts *cannot be treated as distinct theories of recovery*.  In a negligent design case, the risk-utility analysis applies to determine whether the manufacturer is liable.  Thus, the mandate that a product's risk must be weighed against its utility incorporates the concept of "reasonableness," so as to apply negligence principles in the determination of whether the manufacturer defectively designed its product.  Accordingly, the Court of Appeals should not have employed negligence principles separately, but only insofar as they are part of the risk-utility analysis delineated in Banks.  Therefore, Division 1 of the Court of Appeals' opinion does not furnish an independent basis for affirming the trial court's grant of judgment n.o.v.

522 S.E.2d 467, 469 (Ga. 1999) (citations omitted); see also J. Kennard Neal & Catherine Payne, Ga. Products. Liability Law, § 2:1 (4th ed. 2020) ("Although both causes of action apparently can still be pleaded, [a] plaintiff may charge and go to the jury only on the one measure of design defect applicable to both: the risk-utility analysis."); Restatement (Third) of Torts: Products Liability, § 2 cmt. n ("To allow two or more factually identical risk-utility claims to go to a jury under different labels, whether 'strict liability,' 'negligence,' or 'implied warranty of merchantability,' would generate confusion and may well result in inconsistent verdicts.  In proceedings in which multiple theories are alleged, the Restatement leaves to local law the question of the procedural stage in a tort action at which plaintiff must decide under which theory to pursue the case.").  Pursuant to the Georgia Supreme Court's guidance in Ogletree, the Court agrees with Defendants that Plaintiff's negligent design defect claim is duplicative of Plaintiff's strict liability design defect claim, particularly because Plaintiff provides no indication that her negligence claim is predicated on any different facts that do not also support her strict liability for design defect

claim.  See I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1551 (11th Cir. 1986) (noting

that the "general rule" is that a claim is duplicative of another if the "parties, issues and available

relief do not significantly differ between the two actions").

Having found that the negligent design defect claim is duplicative, the question remains

what remedy the Court should employ to cure that redundancy.   In a virtually identical situation

in Cessna v. Ethicon, Inc., 2020 WL 2121392,[8] Judge W. Louis Sands, Sr., of the United States

District Court for the Middle District of Georgia explained:

> In seeking summary judgment, Defendants have not argued that the negligent-design-defect claim fails because there is no genuine issue of material fact; they have argued only that it is duplicative as pled.  And, because Defendants assert that the negligent-design-defect claim is duplicative of a claim against which they have not sought summary judgment (Count V), Defendants have not shown the absence of a genuine issue of material fact by logical extension . . . .  If anything, Defendants have done the opposite: by not moving for summary judgment against Count V, Defendants have left open the possibility that no genuine issue of material fact exists on Count V—and, because the negligent-design-defect claim under Count I is duplicative of Count V, Defendants have, logically, also left open the possibility that no genuine issue of material fact exists for Count I.  Defendants have accordingly failed to meet their burden on summary judgment.  Their Motion for Partial Summary Judgment as to Plaintiffs' claim for "Negligence" (Count I) based on defective design claim is denied.

> Defendants' contention that the negligent-design-defect claim is duplicative of Count V is arguably one for dismissal rather than summary judgment and is more appropriately raised in a motion for partial dismissal.  See, e.g., Belmonte v. Creative Props., Inc., No. 19-61438-CIV-MORENO, 2019 WL 5063832, at *1 (S.D. Fla. Oct. 8, 2019); Kuchenbecker v. Johnson & Johnson, No. 19-61712-CIV-MORENO, 2019 WL 4416079, at *2–3 (S.D. Fla. Sept. 16, 2019); Mukamal v. Bakes, 378 F. App'x 890, 899 (11th Cir. 2010); McManus v. Nat'l Fire & Marine Ins. Co., No. 6:19-cv-367-Orl-41TBS, 2019 WL 5391180, at *2 (M.D. Fla. May 31, 2019).  However, such a motion must be brought at the pleadings stage—now, such a motion is untimely.  See Fed. R. Civ. P. 12(h) (waiving and preserving certain defenses).  Defendants have cited no reason why they did not or could not have made these arguments at the pleadings stage of this case.  Accordingly, to the extent Defendants' Motion for Partial Summary Judgment should be construed as

---

[8]  The Cessna v. Ethicon, Inc. case was, like the case at hand, initiated in the Southern District of West Virginia by the filing of a Short Form Complaint related to the same MDL as Plaintiff Jones's case.  2020 WL 2121392, at *1.  After Defendants filed a motion for summary judgment, the Cessna case was transferred to the Middle District of Georgia.  Id.

a motion for partial dismissal, the Court denies it as untimely.  In doing so, the Court notes that the interests of justice and judicial economy are not hindered because, if Counts I and V indeed overlap, their simultaneous continuation will likely involve the same evidence and arguments and will not result in the expenditure of additional time and resources.  If Plaintiffs later pursue a double recovery for a single injury, Defendants may address that issue at or after trial.  <u>See Gen. Tel. Co.</u>, 446 U.S. at 333 ("It . . . goes without saying that the courts can and should preclude double recovery by an individual."); <u>St. Luke's Cataract & Laser Inst. v. Sanderson</u>, 573 F.3d 1186, 1203 (11th Cir. 2009) ("It is clear that no duplicating recovery of damages for the same injury may be had." (Internal quotation marks omitted.)); <u>see also</u> <u>Manning v. Carnival Corp.</u>, No. 12-22258-CIV, 2012 WL 3962997, at *2 (S.D. Fla. Sept. 11, 2012).

<u>Id.</u> at *10 (record citations omitted).  In the case at hand, the Court agrees with Judge Sands' reasoning, and finds that though Plaintiff's negligent design claim in Count I is duplicative of her strict liability design defect claim in Count V, that is an argument raised for dismissal rather than summary judgment.  Moreover, the Court has concerns regarding the unintended consequences that granting summary judgment on Count I might have on Plaintiff's remaining claims.  Consequently, the Court **DENIES** Defendants' Motion for Summary Judgment as to Count I.  Nonetheless, the Court is concerned that the presentation of duplicative claims at trial creates the potential for an inconsistent verdict and could confuse the jury.  Thus, the Court **DIRECTS** the parties to meet and confer regarding this issue and to present, in the proposed pretrial order, a solution for accurately presenting Plaintiff's design defect claim at trial.  <u>See, e.g.</u>, <u>Jones v. Ethicon, Inc.</u>, No. 7:20-CV-128 (HL), 2020 WL 5836555, at *7 (M.D. Ga. Sept. 30, 2020) (ordering that plaintiff's strict liability design defect claim and negligent design defect clam be consolidated for the purposes of trial).

    **2.**    **Plaintiff's gross negligence claim (Count XIV) is not duplicative of her strict liability design defect claim (Count V).**

The Court next turns to Defendants' contention that Plaintiff's gross negligence claim should be merged with her strict liability design defect claim.  "Gross negligence is defined as the failure to exercise that degree of care that every man of common sense, however inattentive he

may be, exercises under the same or similar circumstances; or lack of the diligence that even careless men are accustomed to exercise." Heard v. City of Villa Rica, 701 S.E.2d 915, 919–20 (Ga. Ct. App. 2010). Thus, a plaintiff must plead "additional necessary elements" for a gross negligence claim that are not required for a negligence claim. Frazier, 911 F. Supp. 2d at 1299. More than "semantics" distinguishes the cause of action for gross negligence from the cause of action for strict liability for a design defect. See generally S K Hand Tool Corp. v. Lowman, 479 S.E.2d 103, 106–07 (Ga. Ct. App. 1996) (finding that a professional malpractice claim did not merge with a strict liability design defect claim because "a viable distinction . . . remains between claims alleging strict liability and those alleging provision of negligent professional services"). Furthermore, Defendants do not cite to—nor has the Court's independent search revealed—a case merging a gross negligence claim with a strict liability design defect claim. Thus, Plaintiff's gross negligence claim (Count XIV) stands, and Defendants are not entitled to summary judgment on that claim.

### 3. Plaintiff's negligent failure to warn claim (Count I) is not duplicative of her strict liability failure to warn claim (Count III).

Finally, regarding whether Plaintiff's negligent failure to warn claim is duplicative of the strict liability failure to warn claim, "[a] claim for negligent failure to warn exists separately from strict liability claims." Bryant v. Hoffman-La Roche, Inc., 585 S.E.2d 723, 730 n.6 (Ga. Ct. App. 2003); see also Battersby v. Boyer, 526 S.E.2d 159, 162 (Ga. Ct. App. 1999) (recognizing that a negligent failure to warn claim may be brought concomitantly with the analogous strict liability claim); May v. Ethicon, Inc., 2020 WL 674357, at *3 ("Count I of the Master Complaint also contains claims for negligent manufacturing defect and negligent failure to warn. These claims are distinct from, and can be brought concomitantly with, analogous claims sounding in strict liability."). Thus, Defendants' attempt to merge the negligent failure to warn claim (part of Count

I) into the strict liability for failure to warn claim (Count III) fails, see id., and Defendants are, thus, not entitled to summary judgment on either of those claims.

## CONCLUSION

In light of the foregoing, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment.  (Doc. 38.)  Specifically, the Court **GRANTS** the Motion as to Counts II, IV, VI, VII, VIII, IX, X, XI, XII, and XV due to Plaintiff's abandonment of those claims. However, notwithstanding the determination that the negligence-based design-defect claim asserted in Count I is duplicative of the strict liability design defect claim asserted in Count V, the Court **DENIES** the Motion as to Counts I, III, V, XIV, XVII, and XVIII.  The following claims remain pending before the Court: Negligence (Count I); Strict Liability – Failure to Warn (Count III); Strict Liability – Design Defect (Count V); Gross Negligence (Count XIV); Punitive Damages (Count XVII); and Discovery Rule and Tolling (Count XVIII).

**SO ORDERED**, this 30th day of March, 2021.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA